UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

HERMENA GLADDEN,                                    :

              Plaintiff,                    :          06 Civ. 3671 (AJP)

        -against-                              :          **OPINION AND ORDER**

COMMISSIONER OF SOCIAL SECURITY,      :

             Defendant.                   :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**ANDREW J. PECK, United States Magistrate Judge:**

        Pro se plaintiff Hermena Gladden brings this action pursuant to § 205(g) of the Social Security Act (the "Act"), 42 U.S.C. § 405(g), challenging the final decision of the Commissioner of Social Security (the "Commissioner") denying Gladden disability insurance benefits.  (Dkt. No. 2: Complaint.)  The Commissioner has moved for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c).  (Dkt. No. 12: Notice of Motion; see also Dkt. No. 8: Answer; Dkt. Nos. 9-10: Admin. Record; Dkt. No. 13: Comm'r Br.)  The parties have consented to decision by a Magistrate Judge pursuant to 28 U.S.C. § 636(c).  (Dkt. No. 22.)

        For the reasons set forth below, the Commissioner's motion for judgment on the pleadings is GRANTED.

## FACTS

### Procedural Background

On October 8, 2003, pro se plaintiff Hermena Gladden applied for disability insurance benefits alleging that she had a disability since September 18, 2003. (Dkt. Nos. 9-10: Administrative Record filed by the Commissioner ["R."] at 110-12, 136-37; see also Dkt. No. 2: Compl. ¶ 4.) Gladden claimed that she could not work because of a herniated disc, arthritis, severe asthma and lung damage. (R. 136.) Gladden's application was denied initially (R. 57-61), and Gladden requested a hearing before an Administrative Law Judge ("ALJ") (R. 62-64A). ALJ David B. Daugherty held a hearing on February 10, 2005, at which Gladden and a vocational expert testified. (R. 45-56.) On March 19, 2005, ALJ Daugherty issued his decision, finding that Gladden was not disabled. (R. 80-90.)

Gladden requested review of the ALJ's decision (R. 91-95), and the Appeals Council vacated the ALJ's decision and remanded for further proceedings (R. 96-98).

On December 6, 2005, Gladden testified at a supplemental hearing before ALJ James B. Reap. (R. 13, 20-44.) On January 27, 2006, ALJ Reap found that Gladden was "not under a disability as defined in the Social Security Act, at any time through the date of this decision." (R. 13-19.) ALJ Reap's decision became the final decision when the Appeals Council denied Gladden's request for review on April 19, 2006. (R. 5-8.)

The issue before the Court is whether the Commissioner's decision that Gladden was not disabled is supported by substantial evidence. The Court finds that it was.

**Hearings Before the ALJs And Other Non-Medical Evidence**

On February 10, 2005 and December 6, 2005, two hearings were held before ALJs David B. Daugherty and James B. Reap, respectively. (R. 13, 20-56.) Gladden appeared without counsel at both hearings. (R. 22, 47.)

Gladden was born on October 8, 1956, and completed three years of college in 1980. (R. 23, 110, 142.) Gladden worked as a correction officer from 1980 to 1998, when she retired with a pension. (R. 52, 137-38, 147-48, 181, 268.) Gladden initially worked with inmates, but for her last five years worked as a personnel officer. (R. 37, 138, 148.) This work involved lifting files and schedules, but never anything heavier than five to ten pounds. (R. 148.) In a typical day, Gladden sat five to seven hours, stood no more than one hour, and walked up to one and one-quarter hours. (R. 138, 148.)

Gladden worked as a driver, and later as a collector, for a newspaper company from November 1999 to September 18, 2003. (R. 23-24, 52, 137-38, 147, 149.) During this time she also worked as a cashier at various retails stores and as a supermarket baker. (R. 137, 147, 150-52.) Gladden served as a volunteer counselor and teacher at her church since 1979 and continued to do so after September 2003. (R. 34, 55, 147.)

Gladden testified that she was in a car accident on November 20, 2002. (R. 27, 31-32, 47, 52.) She crushed her clavicle and "dislocated" her rotator cuff, requiring two surgeries in February 2003 and July 2004. (R. 24-25, 47.) Gladden attempted to return to work when recovering from the clavicle surgery, but stopped on September 18, 2003 when she was hospitalized for two weeks due to "chronic" or "[b]ronchial" asthma. (R. 27, 47, 52-53, 136-37, 163, 254; see also Compl. ¶¶ 4-5.)

Gladden's Disability Report that she filed in connection with her claim for benefits (R. 136-54) claimed that her disability stemmed from a herniated disc, arthritis, asthma and lung damage.[1] (R. 136.) She stated that asthma and "scarring" to the lung caused her difficulty breathing, the most significant reason she could not work. (R. 48, 53, 136, 162-63.) Gladden claimed that she had suffered from arthritis since she was three years old; the arthritis caused her arms and legs to swell in the cold, and made it difficult for her to stand. (R. 41, 51-52, 164.) She also stated that her medications limited her ability to work because they caused dizziness, an inability to concentrate, "nervousness [and a] racy heart," and that smoke, fumes and ink at work caused coughing and wheezing. (R. 30, 32, 40, 48-53, 55, 137, 141, 154, 162; see also R. 254.) Gladden's medications included Prednisone, Xolair, Flovent, Singulair, Xopenex, Advair, Albuterol, Dextra, Metformin and Ferrix. (R. 28-30, 48-50, 64, 94, 141, 179, 220-21, 239-48, 265, 267, 270, 272, 274.)

Gladden stated that she could not lift or carry anything with her left side, or raise her left arm over her head or behind her neck, because of injuries sustained in her 2002 car accident. (R. 25-26, 42, 48, 64A.) This limited Gladden's ability to lift newspapers at work, although following her second shoulder surgery she could do "little things" that she previously was unable to do. (R. 24-25, 154; see also R. 255-60.) Gladden stated that she could use her right side to lift "maybe two half [] gallons of milk and a juice." (R. 42.) Gladden reported that once every three months she saw her treating physician, Dr. Howard Luks, who prescribed physical therapy, recommended home exercise, and sometimes placed her arm in a sling. (R. 26, 34-35.) With regard

---

[1]     During and after her hearings, Gladden limited her disability claim to asthma and related lung problems, but added ongoing mobility issues in her left arm and shoulder caused by her 2002 car accident. (R. 27, 68; see also Compl. ¶¶ 4-5.)

to her respiratory condition, Gladden stated in December 2006 that her "breathing and lung[s] [were] not worse but it hasn't gotten any better," but that she had difficulty breathing after walking for ten or fifteen minutes and had difficulty going up and down stairs.  (R. 28, 33, 41, 47, 160.)  In a written report accompanying her disability claim, however, Gladden stated that she could walk "about 2 miles" before having to stop and rest for three to five minutes.[2]  (R. 161.)  She had no problems sitting.  (R. 41.)  Gladden stated that she received treatment from pulmonologists every other month following her September 2003 hospitalization and continued taking "extensive medication."  (R. 47-48.)

Gladden could perform a variety of limited activities, including five to ten minute walks and household chores like ironing and laundry.  (R. 156, 158-60, 165.)  She shopped for food every week, attended church and bible studies, watched television, went to the movies and visited the local library to use a computer.  (R. 33, 37-40 159-60, 165.)  Friends and family prepared her meals because certain dishes create smoke, which exacerbates Gladden's breathing problems, and because certain cooking implements are too heavy for her to lift.  (R. 156-57, 174.)  Friends and family drive Gladden to church or the store, wash her clothes and hair, and help with any household cleaning that may irritate Gladden's lungs, such as sweeping or vacuuming.  (R. 158, 165, 174.)  Gladden drives alone approximately once a month, and does nothing else alone, except for her daily walks.[3]  (R. 32-34, 160.)

---

[2]    Gladden's opposition to the Commissioner's motion for judgment on the pleadings claims that she never stated that she could walk two miles; rather, she could only walk "about a [quarter mile] which is about [ten minutes, before she would start] breathing heavy and have to take puffs of ABULORAL."  (Dkt. No. 14: Gladden Opp. Aff. at 3.)

[3]    In a written statement to the Social Security Administration filed after her September 2003 (continued...)

**Vocational Expert Testimony**

Vocational expert Mr. McNew testified at the February 10, 2005 administrative hearing.  (R. 45-47, 53-54.)  ALJ Daugherty asked whether there were available jobs for a person who was limited to unskilled jobs that involved only limited lifting, occasional climbing, balancing, stooping, bending, crouching, kneeling and crawling and that were free from smoke or fumes.  (R. 53.)  McNew responded that Gladden could work at the light level as an office clerk or marker or labeler, and at the sedentary level as a general production inspector or a routing clerk.  (R. 54.)  McNew opined that if the ALJ fully credited Gladden's testimony on her physical condition, Gladden would not be able to work any of those jobs, nor perform any of the tasks required by Gladden's previous work.  (R. 54.)

**The Medical Evidence Before the ALJs**

The medical evidence before the ALJs consisted of records from Gladden's treating and consultative physicians.  (R. 180-275.)

**Gladden's Asthma**

On September 18, 2003, Gladden sought treatment at Lawrence Hospital Center after waking with "chest and sinus congestion. . . . [and] chest tightness and wheezing" one day after receiving her first dose of allergy shots.  (R. 184, 200.)  Her condition "was exacerbated by . . . being exposed to cigarettes in the van which she drove that day."  (R. 184, 200.)  An emergency room examination revealed "expiratory wheezes and respiratory distress."  (R. 184, 200.)  Doctors

---

3/       (...continued)
        hospitalization, Gladden indicated that before her hospitalization, "[e]very weekend [she] would drive" to Maryland, Washington D.C., Pennsylvania and Newburgh.  (R. 159.)

administered "Atrovent and albuterol nebulizer treatments every six hours, Decadron . . . intravenous piggyback every 12 hours, Singulair . . . and oxygen as needed," and increased Gladden's Decadron treatment the following day.  (R. 185, 200.)  After four days, Gladden's condition had not improved, and "[p]ulmonary was called in to consult."  (R. 185.)  Doctors ordered a spirometry on September 24, 2003 and discovered "mild to moderate airway obstruction with evidence of bronchospasm."[4/] (R. 185; see 187-89.)  Doctors adjusted Gladden's medications and she gradually improved.  (R. 185.)  By September 28, 2003, she "was feeling much better and afebrile," and was no longer coughing or wheezing.  (R. 185.)  Gladden was discharged on September 29, 2003 in stable condition with diagnoses of asthma exacerbation, acute bronchitis and allergic rhinitis.  (R. 184-85, 189, 201.)  Gladden's medications included Prednisone, Atrovent, Albuterol inhalers, Flovent inhalers, Decadron and Singulair.  (R. 185, 201.)

On October 30, 2003, a computerized tomography ("CT") scan of Gladden's chest revealed "[a] sub pleural micronodule in the right lower lobe," but no other abnormalities or lung disease.  (R. 211.)

On December 1, 2003, Dr. Michael Morelli wrote that Gladden was "under [his] medical and pulmonary care for treatment of Bronchial Asthma and allergies."  (R. 213.)  He indicated that Gladden "cannot be exposed to any smoke or fumes. . . . [and] needs to be in a smoke and dust free environment" to prevent exacerbating her "Bronchial Asthma and allergies." (R. 213.) In a January 26, 2004 report (R. 214-18), Dr. Morelli wrote that Gladden suffered from asthma which produced dyspnea on exertion, but that her symptoms were "well controlled on [the] present

---

[4/]     Gladden's FEV1 exceeded 1.45 liters.  (R. 187-88.)

therapy" (R. 214-15).  Dr. Morelli prescribed Advair, Singulair and Xopenex nebulizer.  (R. 215.)

Dr. Morelli wrote that Gladden could "work in a smoke free environment," occasionally lift and carry

an unspecified weight, pull and push only to a limited and unspecified degree, and could stand, walk

and sit without any limitations.  (R. 216-17.)

On April 16, 2004, Dr. Osahon Ukponmwan wrote that he was treating Gladden for

"reactive air way disease and recently diagnosed Bronchial Asthma."  (R. 210.)  He suggested a

"temporal relationship" between Gladden's symptoms and "her assignment to her present work

location."  (R. 210.)  He "recommended that she avoid . . . direct contact with fresh newspaper

ink/fumes/smoke and other precipitating environmental allergens as possible."  (R. 210.)  On

April 22, 2004, Dr. Morelli wrote that Gladden's "Asthma is exacerbated by various noxious stimuli

including cigarette smoke and it is possible that newsprint may be playing a role in her exacerbations

as well."  (R. 212, 254.)

### Gladden's Left Shoulder

On June 14, 2004, Dr. Lawrence Schulman, a licensed board certified orthopedic

surgeon, examined and evaluated Gladden's left shoulder in conjunction with an insurance claim

filed by Gladden, providing a history of her treatment to date.  (R. 180-83.)  According to Gladden's

statement of her medical history, Dr. Michael Elia, Gladden's treating physician, had found that

Gladden partially dislocated her left shoulder acromioclavicular ("AC") joint following a

November 20, 2002 motor vehicle accident.  (R. 180.)  A January 3, 2003 MRI confirmed Dr. Elia's

diagnosis.  (R. 180.)  Dr. Elia treated Gladden with a sling and medication, but she experienced

continued discomfort.  (R. 180.)  On February 25, 2003, Dr. Elia performed surgery to repair the left

AC shoulder separation.  (R. 180.)  Subsequently, Gladden "was again immobilized in a sling and

then started on physical therapy . . . , which she received three times weekly for approximately three weeks." (R. 180.)

Dr. Elia reported that Gladden fell on her side on June 13, 2003, requiring emergency room treatment. (R. 206.) Gladden was x-rayed and released, and on examination, still experienced "some mild tenderness over the AC joint, but [a] good range of motion and minimal pain." (R. 206.) Dr. Elia recommended that Gladden "discontinue the sling and take Advil as needed." (R. 206.) In July 2003, Gladden resumed physical therapy that she had stopped "because of increasing swelling and discomfort" and resumed Vioxx treatments. (R. 180.) On July 28, 2003, Dr. Elia reported that Gladden was "making slow but steady progress," and that her shoulder was "OK as long as she doesn't overdo it." (R. 205.)

Gladden returned to Dr. Elia on October 24, 2003 with "off-and-on" shoulder discomfort, but indicated that it was "much better than it was a month or so ago." (R. 205.) Dr. Elia found that Gladden had "some mild tenderness over the AC joint. . . . [and] a good range of motion of the shoulder [and that] X-RAYS look[ed] OK." (R. 205.) Dr. Elia discharged Gladden from active care, but she returned on November 10, 2003 with "worsening pain in her shoulder." (R. 205.) Dr. Elia recommended that she "go back to physical therapy for a little while," and resume taking anti-inflammatory medications. (R. 205.) Dr. Elia next saw Gladden on December 15, 2003, and found that Gladden "still ha[d] some soreness in the shoulder . . . . [and] some mild pain when she abducts the shoulder and . . . tenderness over the AC joint region." (R. 204.) Her X-rays still looked fine and he recommended she continue with physical therapy. (R. 204.) Dr. Elia wrote that Gladden was unable to return to work until she was re-evaluated on January 12, 2004. (R. 260.)

On January 12, 2004, Gladden told Dr. Elia that she had periods where she did "very well," but that the she would also have periods where her "pain starts up again." (R. 204.) Gladden's x-rays looked fine, and Dr. Elia prescribed Vioxx, recommended rest and wrote a note stating that Gladden would be unable to return to work until seen again on February 2, 2004. (R. 204, 259.) On January 26, 2004, however, Gladden reported "pain in the shoulder again since she stopped the anti inflammatory medications." (R. 204.) Dr. Elia offered a cortisone injection, but Gladden wanted to resume her anti-inflammatory medication and apply ice before resorting to an injection. (R. 204.) Dr. Elia wrote that Gladden was unable to return to work, and repeated this recommendation on February 4 and March 8, 2004. (R. 255, 257-58.)

On January 31, 2004, Gladden saw Dr. Edward Gundy for a second opinion. (R. 180, 208-09.) Dr. Gundy reported that Gladden "can live with the pain. She denies functional impairment . . . [but admitted] to sensitivity at the injury site." (R. 208.) Gladden wanted to know if "this is good as it gets" and stated that she could "accept that. . . . [and was] willing to work some more on her strength." (R. 208.) Dr. Gundy wrote: "[T]here is no visible atrophy; no deformity is appreciated; there is slight direct tenderness over the AC joint . . . ; abduction is painful at end range, forward flexion, internal rotation, and external rotation are unimpaired; . . . there is no weakness but slight pain on resisted external rotation." (R. 209.) Dr. Gundy performed an MRI and his assessment was that Gladden's "functional capacity and comfort level are 'as good as it gets.'" (R. 209.) Dr. Gundy recommended that Gladden continue strengthening her shoulder girdle with daily exercise. (R. 209.)

On June 9, 2004, Gladden sought another second opinion from Dr. Jonathan L. Holder, who prescribed four weeks of physical therapy. (R. 180, 226.)

On June 14, 2004, Dr. Schulman examined Gladden and reported that Gladden complained of "continued discomfort in the left shoulder and cannot do any overhead reaching, grasping or pulling with the left shoulder," and cannot sleep on her left side.  (R. 180-81.) Dr. Schulman noted that "[s]he did not appear in any acute distress.  She was comfortable with sitting, standing, lying down and changing body position."  (R. 182.)  He also observed "slight atrophy" and "[t]enderness . . . over the left AC joint and over the anterior glenohumeral joint of the shoulder."  (R. 182.)  Dr. Schulman wrote:

> Extension of [Gladden's] left shoulder was limited to 20 degrees compared to 60 degrees on the right.  Forward flexion of the left shoulder could be done to 120 degrees, full on the right.  Active abduction on the left was limited to 95 degrees. . . . External rotation was limited to 50 degrees on the left compared to 60 degrees on the right.

(R. 182.)  Dr. Schulman also noted that "[t]here were no signs of any shoulder instability on the left . . . . [and] no loss of strength of the left shoulder girdle."  (R. 182.)  Dr. Schulman diagnosed traumatic and resistant or recurrent left shoulder impingement syndrome with partial left AC joint separation.  (R. 182.)  Dr. Schulman agreed that Gladden should see Dr. Luks, a sports medicine shoulder expert, and indicated that he would support any additional surgery suggested by Dr. Luks, or conservative therapy and continuing "physical therapy two to three times weekly for approximately five to six weeks."  (R. 181, 183.)

Dr. Luks diagnosed Gladden with "post traumatic residual acromioclavicular (AC) joint arthrosis" and "rotator cuff tendinosus."  (R. 228-29, 253.)  Dr. Luks performed left shoulder arthroscopy on July 21, 2004 and reported no complications.[5]  (R. 228-29.)  On July 29, 2004,

---

[5]     An August 2007 MRI revealed "evidence of resection of the distal clavicle . . . . no evidence
(continued...)

Dr. Luks completed a disability certificate stating that Gladden was "totally disabled" until her next visit on September 1, 2004. (R. 227.)  Dr. Luks repeated his total disability opinion on March 1, May 24 and September 27, 2005 (totally disabled until re-evaluated on January 17, 2006). (R. 256, 263-64.)  Gladden described this surgery as doing "a much better job than the first." (R. 36.)

**Medical Evidence Submitted to the Appeals Council**

On June 28, 2004, Dr. Tania Dempsey treated Gladden for her asthma. (R. 271-75.) Dr. Dempsey reported that Gladden was "[f]eeling much better on [her] current asthma . . . . regimen. Exercise tolerance has improved," but that Gladden complained of shortness of breath. (R. 271.) Gladden displayed asthma "symptoms greater than twice weekly, but less than once daily . . . acute exacerbations twice weekly or more . . . [and] nocturnal symptoms occur[ed] more than once weekly." (R. 271.) Gladden did not have "fever, cough, wheezing, sputum production, itchy/watery eyes, and nasal congestion/drainage. . . . [Gladden] feels that her asthma is under good control." (R. 271.)  Dr. Dempsey reported that Gladden could perform all daily living activities "without symptoms or restrictions," and was under "no acute distress." (R. 271, 274.)  Dr. Dempsey found "no rales, rhonchi, or wheezes," described Gladden's asthma as "improved," and advised Gladden to exercise and lose weight. (R. 274-75.)

---

[5]/     (...continued)
of muscle atrophy. . . . [and] no evidence of recurrent tear involving the rotator cuff tendons." (Dkt. No. 17: Attach.: 8/8/07 MRI Report by Dr. Steve Sharon.)  On October 5, 2007, Dr. Michael Cushner performed left shoulder arthroscopy on Gladden, reporting left shoulder impingement, degenerative joint disease and partial rotator cuff tear. (Dkt. No 23: Attach.: 10/5/07 Operative Report.)  This medical evidence was not submitted before the ALJs or the Appeals Council.

On February 7, 2006, Dr. Bruno Dicosmo treated Gladden for her asthma.  (R. 266-70.)  Gladden reported an "occasional episode of shortness of breath [when] singing over the past week, no cough or phlegm [and] no fever or chills."  (R. 266.)  Dr. Dicosmo noted that Gladden babysat for her niece's eighteen month old daughter during the day.  (R. 268.)  Dr. Dicosmo found no rales, rhonchi, or wheezing, but diagnosed Gladden with a "pulmonary nodule."  (R. 269.)  On February 14, 2006, Dr. Discosmo wrote that Gladden was being "seen in [his] office once a month for Xolair injections to help control her asthma."  (R. 265.)

**The ALJs' Decisions**

On March 19, 2005, ALJ Daugherty denied Gladden's application for SSI benefits in a written decision.  (R. 80-90.)  ALJ Daugherty applied the appropriate five step legal standard, determining that Gladden was not disabled because although Gladden could "no longer perform her past relevant work," the Social Security Administration had successfully proved there were "a significant number of jobs available in the national/regional (New York area) economy that [Gladden could] perform."  (R. 87-89.)

Gladden requested review of ALJ Daugherty's decision.  (R. 91-94.)  The Appeals Council vacated the ALJ's decision and remanded the case for further proceedings in order to evaluate: (1) Dr. Luks' January 24, 2004 opinion that Gladden was totally disabled; and (2) Dr. Luks' and Dr. Elia's opinions that Gladden was "disabled due to her shoulder impairment."  (R. 96-98.)  The Appeals Council specifically directed the ALJ to consider: (1) the weight of the treating sources' opinions; (2) Gladden's "maximum residual functional capacity during the entire period at issue"; and (3) if warranted by the expanded record, any supplemental vocational evidence needed to assess limitations on Gladden's "occupational base."  (R. 97-98.)

As noted above, on remand, on December 6, 2005, Gladden appeared and testified at a supplemental hearing before ALJ Reap.  (R. 13, 20-44.)  The ALJ denied Gladden's application for SSI benefits in a written opinion on January 27, 2006.  (R. 10-19.)

ALJ Reap noted that the record revealed that Gladden had injured her left shoulder in a November 2002 motor vehicle accident, requiring acromioplasty surgery in February 2003.  (R. 15.)  Post-surgery reports indicated "improvement after surgery with physical therapy treatment," "x-rays looked good and she had a good range of motion," "intact rotator cuff tendons" but "mild pain." (R. 15.)  The ALJ stated that "[n]otes submitted by Dr. Elia dated December 2003 to February 2004 indicate[d] that [Gladden] was . . . unable to work until later evaluation dates in March 2004."  (R. 15.)  ALJ Reap also noted that Gladden was "<u>right</u> hand dominant," while her shoulder complaints were for her left shoulder.  (R. 15.)

ALJ Reap referred to a February 2004 examination by Dr. Gundy, who wrote that Gladden complained of left shoulder pain, but that Gladden stated "she was able to live with her pain and denied any functional impairment."  (R. 15.)  Dr. Gundy reported that a physical examination "revealed evidence of tenderness but no deformity or weakness" and described Gladden's functional capacity as "as 'good as it gets.'"  (R. 15.)

ALJ Reap noted Dr. Schulman's June 2004 report stating that Gladden "did not appear in any acute distress and was comfortable sitting, standing and changing body positions" and that Gladden "had some decreased range of motion of the <u>left</u> shoulder with tenderness but no signs of instability."  (R. 15.)  Dr. Schulman diagnosed Gladden with "traumatic <u>left</u> shoulder impingement syndrome with partial left AC joint separation."  (R. 15.)

ALJ Reap referred to Dr. Luks' evidence following a July 2004 arthroscopy surgery he performed on Gladden's left shoulder. (R. 16.) Dr. Luks indicated that Gladden was "totally disabled by her left shoulder orthrosis until further evaluation dates." (R. 16.) ALJ Reap found Dr. Luks' conclusion of total disability unpersuasive despite the "controlling weight" generally given to a treating source's opinion. (R. 16.) ALJ Reap noted that Dr. Luks had not "support[ed] his conclusion with any treatment notes or clinical findings," that Dr. Luks' opinion was inconsistent with Dr. Gundy's findings and with Gladden's own testimony that she could perform "extensive activities of daily living," and that Gladden could make full use of her dominant right hand. (R. 16, 17.)

ALJ Reap concluded that the medical evidence concerning Gladden's left shoulder "reveal[ed] impairments that could have reasonably caused" Gladden's subjective complaints, but that Gladden's "symptoms are not of such intensity, frequency or duration as to preclude substantial gainful activity," and that "the medical evidence does not substantiate [Gladden's] allegations . . . to the degree alleged." (R. 16.) ALJ Reap noted Dr. Elia's 2003 reports that Gladden "reported improvement" and that "x-rays looked good and [Gladden] had good range of motion," as well as Dr. Gundy's February 2004 and Dr. Schulman's June 2004 reports concerning Gladden's left shoulder. (R. 16-17.) ALJ Reap also noted Gladden's own statements that "the second [shoulder] surgery eliminated her pain," that she had "no trouble sitting and can lift over eight pounds with her right arm," and that "she ha[d] trouble with overhead reaching but can shower, use public transportation, and drive," and that she "cooks, does laundry, irons, handles money, socializes, goes to church, the library and [b]ible study classes, takes walks and goes to parties, plays, and the

movies." (R. 17.) ALJ Reap described these activities as indications of "a very active existence." (R. 17.)

ALJ Reap also noted Gladden's history of asthma and her September 2003 hospital treatment from which studies "showed evidence of mild to moderate airway obstruction." (R. 16.) The ALJ noted Dr. Morelli's 2004 reports in which he advised that Gladden's symptoms were "well controlled on her medications," and that Gladden could work in a smoke and dust free environment. (R. 16.) Dr. Morelli also found that Gladden "had no limitations in standing, walking, or sitting and gave no specific lifting or carrying instructions." (R. 16, 17.)

After reviewing this evidence, ALJ Reap performed the appropriate five step legal analysis, as follows: At the first step, ALJ Reap found that Gladden "ha[d] not engaged in substantial gainful activity since her alleged onset date." (R. 14, 18.) At the second and third steps, ALJ Reap found that Gladden's "osteoarthritis of the left shoulder and mild to moderate asthma" constituted "severe" impairments "within the meaning of the Regulations but not 'severe' enough to meet or medically equal, either singly or in combination, one of the impairments listed in Appendix I, Subpart P, Regulation No. 4." (R. 15, 18.) At the fourth step, ALJ Reap found that Gladden retained the functional capacity to perform sedentary work, including the ability to "lift and carry up to ten pounds and stand, walk and sit for six hours per day." (R. 17, 18.) ALJ Reap found that Gladden "should avoid exposure to dust, fumes, gases and environmental irritants. She should avoid overhead reaching with her non-dominant left arm." (R. 17, 18.) The ALJ found that Gladden's job as a corrections officer constituted "past relevant work." (R. 17.) Furthermore, ALJ Reap found that Gladden worked "for the last five years at her [corrections] job . . . [as] a personnel officer, which was sedentary in nature and involved clerical duties." (R. 17-18.) Such work "did not

require the performance of work-related activities precluded by her residual functional capacity."

(R. 18.)  ALJ Reap concluded that Gladden was "not under a 'disability' as defined in the Social

Security Act, at any time through the date of the decision," and denied Gladden's application for SSI

benefits.  (R. 18.)

ALJ Reap's decision became the final decision when the Appeals Council denied

Gladden's request for review on April 19, 2006.  (R. 5-8.)

**ANALYSIS**

I.     **THE APPLICABLE LAW**[6/]

A.     **Definition of Disability**

A person is considered disabled for Social Security benefits purposes when he is

unable "to engage in any substantial gainful activity by reason of any medically determinable

physical or mental impairment which can be expected to result in death or which has lasted or can

be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§ 423(d)(1)(A),

---

[6/]     For additional decisions by this Judge discussing, inter alia, the standard of review in Social
Security cases in language substantially similar to that in this entire section of this Report and
Recommendation, see, e.g., Quezada v. Barnhart, 06 Civ. 2860, 2007 WL 1723615 at *6-10
(S.D.N.Y. June 15, 2007) (Peck, M.J.); Snipe v. Barnhart, 05 Civ. 10472, 2006 WL 2390277
at *8-11 (S.D.N.Y. Aug. 21, 2006) (Peck, M.J.), report & rec. adopted, 2006 WL 2621093
(S.D.N.Y. Sep. 12, 2006); Papp v Comm'r of Soc. Sec., 05 Civ. 5695, 2006 WL 1000397 at
*9-12 (S.D.N.Y. Apr. 18, 2006) (Peck, M.J.); Feliciano v. Barnhart, 04 Civ. 9554, 2005 WL
1693835 at *6-9 (S.D.N.Y. July 21, 2005) (Peck, M.J.); Rodriguez v. Barnhart, 04 Civ. 4514,
2005 WL 643190 at *5-8 (S.D.N.Y. Mar. 21, 2005) (Peck, M.J.); Jiang v. Barnhart, 03 Civ.
0077, 2003 WL 21526937 at *6-10 (S.D.N.Y. July 8, 2003) (Peck, M.J.), report & rec.
adopted, 2003 WL 21755932 (S.D.N.Y. July 30, 2003); de Roman v. Barnhart, 03 Civ. 0075,
2003 WL 21511160 at *6-10 (S.D.N.Y. July 2, 2003) (Peck, M.J.); Acosta v. Barnhart, 99
Civ. 1355, 2003 WL 1877228 at *7-11 (S.D.N.Y. Apr. 10, 2003) (Peck, M.J.); Alvarez v.
Barnhart, 02 Civ. 3121, 2002 WL 31663570 at *5-7 (S.D.N.Y. Nov. 26, 2002) (Peck, M.J.)
(citing my prior decisions), report & rec. adopted, 2003 WL 272063 (S.D.N.Y. Jan. 16,
2003).

18

1382c(a)(3)(A); <u>see</u>, <u>e.g.</u>, <u>Betances</u> v. <u>Comm'r of Soc. Sec.</u>, 206 Fed. Appx. 25, 26 (2d. Cir. 2006); <u>Surgeon</u> v. <u>Comm'r of Soc. Sec.</u>, 190 Fed. Appx. 37, 39 (2d Cir. 2006); <u>Rodriguez</u> v. <u>Barnhart</u>, 163 Fed. Appx. 15, 16 (2d Cir. 2005); <u>Malone</u> v. <u>Barnhart</u>, 132 Fed. Appx. 940, 941 (2d Cir. 2005); <u>Barnhart</u> v. <u>Thomas</u>, 540 U.S. 20, 23, 124 S. Ct. 376, 379 (2003); <u>Barnhart</u> v. <u>Walton</u>, 535 U.S. 212, 214, 122 S. Ct. 1265, 1268 (2002); <u>Butts</u> v. <u>Barnhart</u>, 388 F.3d 377, 383 (2d Cir. 2004), <u>amended on other grounds</u>, 416 F.3d 101 (2d Cir. 2005); <u>Green-Younger</u> v. <u>Barnhart</u>, 335 F.3d 99, 106 (2d Cir. 2003); <u>Veino</u> v. <u>Barnhart</u>, 312 F.3d 578, 586 (2d Cir. 2002); <u>Draegert</u> v. <u>Barnhart</u>, 311 F.3d 468, 472 (2d Cir. 2002).[7/]

> The combined effect of all impairments must be of such severity that the person is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B); <u>see</u>, <u>e.g.</u>, <u>Barnhart</u> v. <u>Thomas</u>, 540 U.S. at 23, 124 S. Ct. at 379; <u>Barnhart</u> v. <u>Walton</u>, 535 U.S. at 218, 122 S. Ct. at 1270; <u>Betances</u> v. <u>Comm'r of Soc. Sec.</u>, 206 Fed. Appx. at 26; <u>Butts</u> v. <u>Barnhart</u>, 388 F.3d at 383; <u>Draegert</u> v. <u>Barnhart,</u> 311 F.3d at 472.[8/]

---

[7/]    See also, <u>e.g.</u>, <u>Shaw</u> v. <u>Chater</u>, 221 F.3d 126, 131 (2d Cir. 2000); <u>Curry</u> v. <u>Apfel</u>, 209 F.3d 117, 122 (2d Cir. 2000); <u>Brown</u> v. <u>Apfel</u>, 174 F.3d 59, 62 (2d Cir. 1999); <u>Tejada</u> v. <u>Apfel</u>, 167 F.3d 770, 773 (2d Cir. 1999); <u>Rosa</u> v. <u>Callahan</u>, 168 F.3d 72, 77 (2d Cir. 1999); <u>Balsamo</u> v. <u>Chater</u>, 142 F.3d 75, 79 (2d Cir. 1998); <u>Perez</u> v. <u>Chater</u>, 77 F.3d 41, 46 (2d Cir. 1996); <u>Martinez</u> v. <u>Massanari</u>, 242 F. Supp. 2d 372, 375 (S.D.N.Y. 2003); <u>Garcia</u> v. <u>Barnhart</u>, 01 Civ. 8300, 2003 WL 68040 at *4 (S.D.N.Y. Jan. 7, 2003); <u>Rebull</u> v. <u>Massanari</u>, 240 F. Supp. 2d 265, 268 (S.D.N.Y. 2002); <u>Worthy</u> v. <u>Barnhart</u>, 01 Civ. 7907, 2002 WL 31873463 at *4 (S.D.N.Y. Dec. 23, 2002); <u>Perez</u> v. <u>Barnhart</u>, 234 F. Supp. 2d 336, 339 (S.D.N.Y. 2002).

[8/]    See also, <u>e.g.</u>, <u>Shaw</u> v. <u>Chater</u>, 221 F.3d at 131-32; <u>Rosa</u> v. <u>Callahan</u>, 168 F.3d at 77; <u>Balsamo</u> v. <u>Chater</u>, 142 F.3d at 79; <u>Garcia</u> v. <u>Barnhart</u>, 2003 WL 68040 at *4; <u>Soto</u> v. <u>Barnhart</u>, 01 Civ. 7905, 2002 WL 31729500 at *4 (S.D.N.Y. Dec. 4, 2002).

In determining whether an individual is disabled for disability benefit purposes, the Commissioner must consider:  "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts;  (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience."  Mongeur v. Heckler, 722 F.2d 1033, 1037 (2d Cir. 1983) (per curiam); see, e.g., Brunson v. Callahan, No. 98-6229, 199 F.3d 1321 (table), 1999 WL 1012761 at *1 (2d Cir. Oct. 14, 1999); Brown v. Apfel, 174 F.3d at 62; Carroll v. Sec'y of Health & Human Servs., 705 F.2d 638, 642 (2d Cir. 1983).[9/]

## B.    Standard of Review

A court's review of the Commissioner's final decision is limited to determining whether there is "substantial evidence" in the record to support such determination.  E.g., Acierno v. Barnhart, 475 F.3d 77, 80-81 (2d Cir.), cert. denied, 127 S. Ct. 2981 (2007); Halloran v. Barnhart 362 F.3d 28, 31 (2d Cir. 2004), Jasinski v. Barnhart, 341 F.3d 182, 184 (2d Cir. 2003); Green-Younger v. Barnhart, 335 F.3d 99, 105-06 (2d Cir. 2003); Veino v. Barnhart, 312 F.3d 578, 586 (2d Cir. 2002); Vapne v. Apfel, 36 Fed. Appx. 670, 672 (2d Cir.), cert. denied, 537 U.S. 961, 123 S. Ct. 394 (2002); Horowitz v. Barnhart, 29 Fed. Appx. 749, 752 (2d Cir. 2002); Machadio v. Apfel, 276 F.3d 103, 108 (2d Cir. 2002); 42 U.S.C. § 405(g).[10/]  "'Thus, the role of the district court is quite

---

[9/]    See also, e.g., Rivas v. Barnhart, 01 Civ. 3672, 2005 WL 183139 at *16 (S.D.N.Y. Jan. 27, 2005); Batista v. Comm'r of Soc. Sec., 03 Civ. 10121, 2004 WL 2700104 at *7 (S.D.N.Y. Nov. 23, 2004); Rebull v. Massanari, 240 F. Supp. 2d at 268; Worthy v. Barnhart, 2002 WL 31873463 at *4.

[10/]    See also, e.g., Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000); Curry v. Apfel, 209 F.3d 117, 122 (2d Cir. 2000); Brown v. Apfel, 174 F.3d 59, 61 (2d Cir. 1999); Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir. 1999); Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999); Schaal v. Apfel, 134 F.3d 496, 501 (2d Cir. 1998); Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996); Rivera v. Sullivan, 923 F.2d 964, 967 (2d Cir. 1991); Mongeur v. Heckler, 722 F.2d 1033,
(continued...)

limited and substantial deference is to be afforded the Commissioner's decision.'"  Morris v. Barnhart, 02 Civ. 0377, 2002 WL 1733804 at *4 (S.D.N.Y. July 26, 2002).[11/]

The Supreme Court has defined "substantial evidence" as "'more than a mere scintilla [and] such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427 (1971); accord, e.g., Halloran v. Barnhart, 362 F.3d at 31; Jasinski v. Barnhart, 341 F.3d at 184; Veino v. Barnhart, 312 F.3d at 586; Shaw v. Chater, 221 F.3d at 131; Curry v. Apfel, 209 F.3d at 122; Brown v. Apfel, 174 F.3d at 61; Rosa v. Callahan, 168 F.3d at 77; Tejada v. Apfel, 167 F.3d at 773-74; Perez v. Chater, 77 F.3d at 46.[12/]  "[F]actual issues need not have been resolved by the [Commissioner] in accordance

---

(...continued)
1038 (2d Cir. 1983); Dumas v. Schweiker, 712 F.2d 1545, 1550 (2d Cir. 1983); Rodriguez v. Barnhart, 03 Civ. 7272, 2004 WL 1970141 at *8 (S.D.N.Y. Aug. 23, 2004), aff'd, 163 Fed. Appx. 15 (2d Cir. 2005); Martinez v. Massanari, 242 F. Supp. 2d 372, 375 (S.D.N.Y. 2003); Duran v. Barnhart, 01 Civ. 8307, 2003 WL 103003 at *7 (S.D.N.Y. Jan. 13, 2003); Garcia v. Barnhart, 01 Civ. 8300, 2003 WL 68040 at *3 (S.D.N.Y. Jan. 7, 2003); Rebull v. Massanari, 240 F. Supp. 2d 265, 268-69 (S.D.N.Y. 2002); Worthy v. Barnhart, 01 Civ. 7907, 2002 WL 31873463 at *3 (S.D.N.Y. Dec. 23, 2002); Norris v. Barnhart, 01 Civ. 0902, 2002 WL 31778794 at *3 (S.D.N.Y. Dec. 12, 2002); Morales v. Barnhart, 01 Civ. 4057, 2002 WL 31729526 at *6 (S.D.N.Y. Dec. 5, 2002).

[11/]  See also, e.g., Duran v. Barnhart, 2003 WL 103003 at *9; Florencio v. Apfel, 98 Civ. 7248, 1999 WL 1129067 at *5 (S.D.N.Y. Dec. 9, 1999) ("The Commissioner's decision is to be afforded considerable deference; the reviewing court should not substitute its own judgment for that of the Commissioner, even if it might justifiably have reached a different result upon a de novo review.") (internal quotations & alterations omitted).

[12/]  See also, e.g., Green-Younger v. Barnhart, 335 F.3d at 106; Batitsta v. Comm'r of Soc. Sec., 03 Civ. 10121, 2004 WL 2700104 at *5 (S.D.N.Y. Nov. 23, 2004); Rodriguez v. Barnhart, 2004 WL 1970141 at *9; Martinez v. Massanari, 242 F. Supp. 2d at 375; Duran v. Barnhart, 2003 WL 103003 at *9; Garcia v. Barnhart, 2003 WL 68040 at *3; Worthy v. Barnhart, 2002 WL 31873463 at *3; Norris v. Barnhart, 2002 WL 31778794 at *3; Morales v. Barnhart, 2002 WL 31729526 at *6; Soto v. Barnhart, 01 Civ. 7905, 2002 WL 31729500 at *4 (S.D.N.Y. Dec. 4, 2002).

with what we conceive to be the preponderance of the evidence." <u>Rutherford</u> v. <u>Schweiker</u>, 685 F.2d 60, 62 (2d Cir. 1982), <u>cert. denied</u>, 459 U.S. 1212, 103 S. Ct. 1207 (1983).  The Court must be careful not to "'substitute its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a <u>de novo</u> review.'" <u>Jones</u> v. <u>Sullivan</u>, 949 F.2d 57, 59 (2d Cir. 1991).[13]  However, the Court will not defer to the Commissioner's determination if it is "'the product of legal error.'"  <u>E.g.</u>, <u>Duvergel</u> v. <u>Apfel</u>, 99 Civ. 4614, 2000 WL 328593 at *7 (S.D.N.Y. Mar. 29, 2000) (Peck, M.J.); <u>see also</u>, <u>e.g.</u>, <u>Butts</u> v. <u>Barnhart</u>, 388 F.3d 377, 384 (2d Cir. 2004), <u>amended on other grounds</u>, 416 F.3d 101 (2d Cir. 2005); <u>Tejada</u> v. <u>Apfel</u>, 167 F.3d at 773 (citing cases).

　　　　　The Commissioner's regulations set forth a five-step sequence to be used in evaluating disability claims.  20 C.F.R. §§ 404.1520, 416.920; <u>see</u>, <u>e.g.</u>, <u>Barnhart</u> v. <u>Thomas</u>, 540 U.S. 20, 24-25, 124 S. Ct. 376, 379-80 (2003); <u>Bowen</u> v. <u>Yuckert</u>, 482 U.S. 137, 140, 107 S. Ct. 2287, 2291 (1987).  The Supreme Court has articulated the five steps as follows:

> Acting pursuant to its statutory rulemaking authority, 42 U.S.C. §§ 405(a) (Title II), 1383(d)(1) (Title XVI), the agency has promulgated regulations establishing a five-step sequential evaluation process to determine disability.  See 20 CFR § 404.1520 (2003) (governing claims for disability insurance benefits); § 416.920 (parallel regulation governing claims for Supplemental Security Income).  If at any step a finding of disability or non-disability can be made, the SSA will not review the claim further.  [1] At the first step, the agency will find non-disability unless the claimant shows that he is not working at a "substantial gainful activity."  §§ 404.1520(b), 416.920(b).  [2] At step two, the SSA will find non-disability unless the claimant shows that he has a "severe impairment," defined as "any impairment or combination

---

[13]    See also, <u>e.g.</u>, <u>Colling</u> v. <u>Barnhart</u>, No. 06-2513, 2007 WL 4102734 at *1 (2d Cir. Nov. 19, 2007); <u>Veino</u> v. <u>Barnhart</u>, 312 F.3d at 586; <u>Toles</u> v. <u>Chater</u>, No. 96-6065, 104 F.3d 351 (table), 1996 WL 545591 at *1 (2d Cir. Sept. 26, 1996); <u>Rodriguez</u> v. <u>Barnhart</u>, 2004 WL 1970141 at *9; <u>Garcia</u> v. <u>Barnhart</u>, 2003 WL 68040 at *3; <u>Morales</u> v. <u>Barnhart</u>, 2002 WL 31729526 at *6.

of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities."  §§ 404.1520(c), 416.920(c).  [3] At step three, the agency determines whether the impairment which enabled the claimant to survive step two is on the list of impairments presumed severe enough to render one disabled; if so, the claimant qualifies.  §§ 404.1520(d), 416.920(d).  [4] If the claimant's impairment is not on the list, the inquiry proceeds to step four, at which the SSA assesses whether the claimant can do his previous work; unless he shows that he cannot, he is determined not to be disabled.  [5] If the claimant survives the fourth stage, the fifth, and final, step requires the SSA to consider so-called "vocational factors" (the claimant's age, education, and past work experience), and to determine whether the claimant is capable of performing other jobs existing in significant numbers in the national economy.  §§ 404.1520(f), 404.1560(c), 416.920(f), 416.960(c).

Barnhart v. Thomas, 540 U.S. at 24-25, 124 S. Ct. at 379-80 (fns. omitted);[14/] accord, e.g., Williams v. Comm'r of Soc. Sec., 236 Fed. Appx. 641, 643 (2d Cir. 2007); Betances v. Comm'r of Soc. Sec., 206 Fed. Appx. at 26; Jasinski v. Barnhart, 341 F.3d at 183-84; Green-Younger v. Barhnart, 335 F.3d at 106; Draegert v. Barnhart, 311 F.3d 468, 472 (2d Cir. 2002); Shaw v. Chater, 221 F.3d at 132; Curry v. Apfel, 209 F.3d at 122; Brown v. Apfel, 174 F.3d at 62; Rosa v. Callahan, 168 F.3d at 77; Tejada v. Apfel, 167 F.3d at 774.[15/]

---

[14/]    Amendments to 20 C.F.R. 404.1520 became effective September 25, 2003.  See 68 Fed. Reg. 51153, 2003 WL 22001943 (Aug. 26, 2003); see also Barnhart v. Thomas, 540 U.S. at 25 n.2, 124 S. Ct. at 380 n.2.  The amendments, inter alia, added a new § 404.1520(e) and redesignated previous §§ 404.1520(e) and (f) as §§ 404.1520(f) and (g), respectively.  20 C.F.R. § 404.1520; see 68 Fed. Reg. 51156.  The new § 404.1520(e) explains that if the claimant has an impairment that does not meet or equal a listed impairments, the SSA will assess the claimant's residual functional capacity.  20 C.F.R. § 404.1520(e).  The SSA uses the residual functional capacity assessment at step four to determine whether the claimant can perform past relevant work and, if necessary, at step five to determine whether the claimant can do any work.  See 68 Fed. Reg. 51156. The ALJ appropriately utilized the residual functional capacity assessment amendments in this case.  (See pages 16-17 above.)

[15/]    See also, e.g., Balsamo v. Chater, 142 F.3d at 79-80; Schaal v. Apfel, 134 F.3d at 501; Perez v. Chater, 77 F.3d at 46; Dixon v. Shalala, 54 F.3d 1019, 1022 (2d Cir. 1995); Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982); Batitsta v. Comm'r of Soc. Sec., 2004 WL 2700104 at *6; Rodriguez v. Barnhart, 2004 WL 1970141 at *9-10; Martinez v. Massanari, (continued...)

The claimant bears the burden of proof as to the first four steps; if the claimant meets the burden of proving that he cannot return to his past work, thereby establishing a prima facie case, the Commissioner then has the burden of proving the last step, that there is other work the claimant can perform considering not only his medical capacity but also his age, education and training.  See, e.g., Barnhart v. Thomas, 540 U.S. at 25, 124 S. Ct. at 379-80; Williams v. Comm'r of Soc. Sec., 236 Fed. Appx. at 643; Betances v. Comm'r of Soc. Sec., 206 Fed. Appx. at 26; Butts v. Barnhart, 388 F.3d 377, 383 (2d Cir. 2004); Green-Younger v. Barnhart, 335 F.3d at 106; Draegert v. Barnhart, 311 F.3d at 472; Curry v. Apfel, 209 F.3d at 122; Rosa v. Callahan, 168 F.3d at 80; Perez v. Chater, 77 F.3d at 46; Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982); Rodriguez v. Barnhart, 2004 WL 1970141 at *10.

C.    **The Treating Physician Rule**

The "treating physician's rule" is a series of regulations set forth by the Commissioner in 20 C.F.R. § 404.1527 detailing the weight to be accorded a treating physician's opinion. Specifically, the Commissioner's regulations provide that:

> If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.

---

15/    (...continued)
242 F. Supp. 2d at 375-76; Garcia v. Barnhart, 2003 WL 68040 at *4; Worthy v. Barnhart, 2002 WL 31873463 at *4; Norris v. Barnhart, 2002 WL 31778794 at *3-4; Perez v. Barnhart, 234 F. Supp. 2d 336, 339 (S.D.N.Y. 2002); Soto v. Barnhart, 2002 WL 31729500 at *4-5.

In addition, while using the five step approach, where mental complaints are at issue, the Commissioner "must follow a special technique at each level in the administrative review process."  20 C.F.R. §§ 404.1520a, 416.920a.

20 C.F.R. § 404.1527(d)(2); see, e.g., Colling v. Barnhart, No. 06-2513, 2007 WL 4102734 at *1 (2d

Cir. Nov. 19, 2007); Lamorey v. Barnhart, 158 Fed. Appx. 361, 362 (2d Cir. 2006); Foxman v.

Barnhart, 157 Fed. Appx. 344, 346 (2d Cir. 2005); Tavarez v. Barnhart, 124 Fed. Appx. 48, 49 (2d

Cir. 2005); Donnelly v. Barnhart, 105 Fed. Appx. 306, 308 (2d Cir 2004); Halloran v. Barnhart, 362

F.3d 28, 32 (2d Cir. 2004); Green-Younger v. Barnhart, 335 F.3d 99, 106 (2d Cir. 2003); Kamerling

v. Massanari, 295 F.3d 206, 209 n.5 (2d Cir. 2002); Jordan v. Barnhart, 29 Fed. Appx. 790, 792 (2d

Cir. 2002).[16]

       Further, the regulations specify that when controlling weight is not given a treating

physician's opinion (because it is not "well supported" by other medical evidence), the Court should

consider the following factors in determining the weight to be given such an opinion: (1) the length

of the treatment relationship and the frequency of examination; (2) the nature and extent of the

treatment relationship; (3) the evidence that supports the treating physician's report; (4) how

consistent the treating physician's opinion is with the record as a whole; (5) the specialization of the

physician in contrast to the condition being treated; and (6) any other factors which may be

significant. 20 C.F.R. § 404.1527(d)(2); see, e.g., Foxman v. Barnhart, 157 Fed. Appx. at 346-47;

Halloran v. Barnhart, 362 F.3d at 32; Shaw v. Chater, 221 F.3d at 134; Clark v. Comm'r, 143 F.3d

at 118; Schaal v. Apfel, 134 F.3d at 503.[17]

---

[16]    See also, e.g., Bond v. Soc. Sec. Admin., 20 Fed. Appx. 20, 21 (2d Cir. 2001); Shaw v. Chater, 221 F.3d 126, 134 (2d Cir. 2000); Rosa v. Callahan, 168 F.3d 72, 78-79 (2d Cir. 1999); Clark v. Comm'r of Soc. Sec., 143 F.3d 115, 118 (2d Cir. 1998); Schaal v. Apfel, 134 F.3d 496, 503 (2d Cir. 1998); Martinez v. Massanari, 242 F. Supp. 2d 372, 376 (S.D.N.Y. 2003); Garcia v. Barnhart, 01 Civ. 8300, 2003 WL 68040 at *5 & n.4-5 (S.D.N.Y. Jan. 7, 2003).

[17]    See also, e.g., Kugielska v. Astrue, 06 Civ. 10169, 2007 WL 3052204 at *8 (S.D.N.Y. (continued...)

25

The Commissioner's "treating physician" regulations were approved by the Second Circuit in <u>Schisler</u> v. <u>Sullivan</u>, 3 F.3d 563, 568 (2d Cir. 1993).

## II.    APPLICATION OF THE FIVE STEP SEQUENCE TO GLADDEN'S CLAIMS

The Court must determine if the Commissioner's decision that Gladden was not disabled was supported by substantial evidence.

### A.    Gladden Was Not Engaged in Substantial Gainful Activity

The first inquiry is whether Gladden was engaged in substantial gainful activity after her application for SSI benefits.  "Substantial gainful activity" is defined as work that involves "doing significant and productive physical or mental duties" and "[i]s done (or intended) for pay or profit." 20 C.F.R. § 404.1510.[18/]  The ALJ's conclusion that Gladden was not engaged in substantial activity during the applicable time period (R. 14, 18) is not disputed.

---

[17/]    (...continued)
Oct. 16, 2007); <u>Hill</u> v. <u>Barnhart</u>, 410 F. Supp. 2d 195, 217 (S.D.N.Y. 2006); <u>Klett</u> v. <u>Barnhart</u>, 303 F. Supp. 2d 477, 484 (S.D.N.Y 2004); <u>Martinez</u> v. <u>Massanari</u>, 242 F. Supp. 2d at 376; <u>Garcia</u> v. <u>Barnhart</u>, 2003 WL 68040 at *6; <u>Rebull</u> v. <u>Massanari</u>, 240 F. Supp. 2d 265, 268 (S.D.N.Y. 2002).

[18/]    <u>See</u>, <u>e.g.</u>, <u>Quezada</u> v. <u>Barnhart</u>, 06 Civ. 2870, 2007 WL 1723615 at *10 (S.D.N.Y. June 15, 2007) (Peck, M.J.); Snipe v. <u>Barnhart</u>, 05 Civ. 10472, 2006 WL 2390277 at *11 (S.D.N.Y. Aug. 21, 2006) (Peck, M.J.) (citing my prior decisions), <u>report & rec. adopted</u>, 2006 WL 2621093 (S.D.N.Y. Sep. 12, 2006); <u>Jiang</u> v. <u>Barnhart</u>, 03 Civ. 0077, 2003 WL 21526937 at *10 (S.D.N.Y. July 8, 2003) (Peck, M.J.) (citing my prior decisions), <u>report & rec. adopted</u>, 2003 WL 21755932 (S.D.N.Y. July 30, 2003); <u>Alvarez</u> v. <u>Barnhardt</u>, 02 Civ. 3121, 2002 WL 31663570 at *9 (S.D.N.Y. Nov. 26, 2002) (Peck, M.J.) (citing my prior decisions), <u>report & rec. adopted</u>, 2003 WL 272063 (S.D.N.Y. Jan. 16, 2003).

**B.      Gladden Demonstrated Severe Physical Impairments That Significantly Limited Her Ability To Do Basic Work Activities[19]** _____

The next step of the analysis is to determine whether Gladden proved that she had a severe impairment or combination of impairments that "significantly limit[ed] her physical or mental ability to do basic work activities."  20 C.F.R. § 404.1521(a).  The ability to do basic work activities is defined as "the abilities and aptitudes necessary to do most jobs."  20 C.F.R. § 404.1521(b).  "Basic work activities" include:

> . . . walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling . . . seeing, hearing, and speaking. . . .[u]nderstanding, carrying out, and remembering simple instructions. . . . [u]se of judgment. . . . [r]esponding appropriately to supervision, co-workers and usual work situations.

20 C.F.R. § 404.1521(b)(1)-(5).  The Second Circuit has warned that the step two analysis may not do more than "screen out de minimis claims."  Dixon v. Shalala, 54 F.3d 1019, 1030 (2d Cir. 1995).

"A finding that a condition is not severe means that the plaintiff is not disabled, and the Administrative Law Judge's inquiry stops at the second level of the five-step sequential evaluation process."  Rosario v. Apfel, No. 97 CV 5759, 1999 WL 294727 at *5 (E.D.N.Y. Mar. 19, 1999) (citing 20 C.F.R. § 404.1520(C)).  On the other hand, if the disability claim rises above the de minimis level, then the further analysis of step three and beyond must be undertaken.  See, e.g., Dixon v. Shalala, 54 F.3d at 1030.

"A finding of 'not severe' should be made if the medical evidence establishes only a 'slight abnormality' which would have 'no more than a minimal effect on an individual's ability to

_____

[19]    For additional decisions by this Judge discussing the second step of the sequential analysis in language substantially similar to that in this section of this Report and Recommendation, see, e.g., cases cited in fn.17 above.

work.'"  <u>Rosario</u> v. <u>Apfel</u>, 1999 WL 294727 at *5 (quoting <u>Bowen</u> v. <u>Yuckert</u>, 482 U.S. 137, 154 n.12, 107 S. Ct. 2287, 2298 n.12 (1987)).

The ALJ determined that the medical evidence indicated that Gladden's left shoulder osteoarthritis and mild to moderate asthma were impairments that were severe within the meaning of the Regulations.  (R. 15, 18.)  These findings are not disputed (<u>see</u> Dkt. No. 13: Gov't Br. at 14), and the Court therefore proceeds to the third step of the five part analysis.

### C.    <u>Gladden Did Not Have A Disability Listed in Appendix 1 of the Regulations</u>

The third step of the five-part test requires a determination of whether Gladden  had an impairment listed in Appendix 1 of the Regulations. 20 C.F.R., Pt. 404, Subpt. P, App. 1. "These are impairments acknowledged by the [Commissioner] to be of sufficient severity to preclude gainful employment.   If a claimant's condition meets or equals the 'listed' impairments, he or she is conclusively presumed to be disabled and entitled to benefits." <u>Dixon</u> v. <u>Shalala</u>, 54 F.3d 1019, 1022 (2d Cir. 1995); <u>accord</u>, <u>e.g.</u>, cases cited in fn.17 above.

The ALJ found that Gladden's medical conditions – left shoulder osteoarthritis and asthma – were "severe, [but not] 'severe' enough to meet or medically equal, either singly or in combination, one of the impairments listed in Appendix I, Subpart P, Regulation No. 4." (R. 15, 18.) Appendix 1 provides a categorization of physical impairments, including the musculoskeletal, respiratory, cardiovascular, digestive, and multiple body, systems.  <u>See</u> 20 C.F.R., Pt. 404, Subpt. P, App. 1, §§ 1.00, 3.00, 4.00, 5.00, 10.00.

### 1.    Gladden Does Not Have Appendix I Osteoarthritis

Gladden's left shoulder injuries and syndromes do not satisfy the Appendix 1 requirement.  Gladden's shoulder injuries and syndromes would have to qualify as "Major dysfunction[s] of a joint" to qualify as an impairment in Appendix 1:

> Characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s).  With . . .
>
> B.  Involvement of one major peripheral joint in each upper extremity (i.e., shoulder, elbow, or wrist-hand), resulting in inability to perform fine and gross movements effectively, as defined in 1.00B2c.

20 C.F.R., Pt. 404 , Subpt. P, App. 1, § 1.02.  "Inability to perform fine and gross movements" means:

> an extreme loss of function of both upper extremities; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities.  To use their upper extremities effectively, individuals must be capable of sustaining such functions as reaching, pushing, pulling, grasping, and fingering to be able to carry out activities of daily living.  Therefore, examples of inability to perform fine and gross movements effectively include, but are not limited to, the inability to prepare a simple meal and feed oneself, the inability to take care of personal hygiene, the inability to sort and handle papers or files, and the inability to place files in a file cabinet at or above waist level.

20 C.F.R., Pt. 404 , Subpt. P, App. 1, § 1.00B2c.  Gladden claimed she could not lift or carry anything with her left side, raise her left arm over her head or sleep on her left side.  (See page 4 above.)  Doctors noted that Gladden should not return to work, and following her second shoulder operation, Dr. Luks wrote that Gladden was "totally disabled."  (See pages 10-12 above.)

Doctors also stated that Gladden experienced a "good range of motion and minimal pain," that her shoulder was "OK as long as she doesn't over do it, that her "X-rays look[ed] OK,"

Case 1:06-cv-03671-AJP    Document 24    Filed 02/29/2008    Page 29 of 34

that there was "no visible atrophy, that Gladden did not appear in any acute distress. . . . [and] was comfortable with sitting, standing, lying down, and changing body position," and reported that Gladden denied "functional impairment [but admitted] to sensitivity at the injury site." (See pages 9-12 above.)  In addition, Gladden never injured her right shoulder and consistently performed movements that allowed her to successfully undertake many basic, daily physical activities.[20/]  (See pages 5-6, 8-12 above.)

Because Gladden's shoulder injuries did not very seriously interfere with Gladden's ability to independently initiate, sustain, or complete activities, they do not qualify as major dysfunctions of the joint.

Substantial evidence supports the ALJ's determination that Gladden's shoulder impairments were not "severe" enough to meet the requirements of the listed impairments in Appendix 1.  (R. 15, 18.)

## 2.    Gladden's Asthma Does Not Satisfy the Appendix 1 Requirements

Gladden's asthma does not satisfy the Appendix 1 requirements.  In order to qualify for a disability, a claimant must suffer from asthma attacks or chronic asthma bronchitis.  20 C.F.R., Pt. 404 , Subpt. P, App. 1, § 3.03.  Gladden suffered from bronchial asthma (see pages 7-8), which

---

[20/]    Gladden needed help in completing certain activities that required heavy lifting or that required two hands, such as cleaning her laundry, cooking certain dishes and washing her hair, but could successfully complete other basic tasks.  (See pages 5-6 above; see also Gladden Opp. Aff. at 3.)  Gladden also never suffered "an extreme loss of function" in both shoulders.  20 C.F.R., Pt. 404 , Subpt. P, App. 1, § 1.00B2c; see, e.g., Hernandez v. Barnhart, 05 Civ. 9586, 2007 WL 2710388 at *8-9 (S.D.N.Y. Sept. 8, 2007) (Impairment did not meet the listing in § 1.02 because "only one upper extremity [was] affected with 'major dysfunction.'"); Spain v. Barnhart, 04 Civ. 2859, 2005 WL 1423358 at *7 (S.D.N.Y. June 16, 2005) ("[B]ecause only one of [plaintiff's] hands is injured, the impairment of his left hand does not qualify as a listed impairment" under § 1.02.).

H:\OPIN\GLADDEN

is defined as "[c]hronic obstructive pulmonary disease, due to any cause, with the FEV1 [Forced

Expiratory Volume in one second] equal to or less than the values specified in table I corresponding

to the person's height without shoes."  20 C.F.R., Pt. 404 , Subpt. P, App. 1, § 3.02A.

During her September 2003 hospital stay, doctors performed a pulmonary function

test called a spirometry to determine the severity of Gladden's condition; the results confirmed that

Gladden's asthma was not severe enough to qualify as an Appendix I disability.[21]

Substantial evidence supports ALJ Reap's determination that the impairments

evidenced in Gladden's medical records did not meet the requirements of the listed impairments in

Appendix 1.  (R. 15, 18.)

### D.    Gladden Had the Ability to Perform Her Past (Sedentary) Work

The fourth prong of the five part analysis is whether Gladden had the residual

functional capacity to perform her past relevant work, that is, her work as a personnel officer.  (See

page 3 above.)   ALJ Reap found that Gladden had the residual functional capacity to perform

sedentary work.  (R. 17, 18.)  "Sedentary work"

> involves lifting no more than 10 pounds at a time and occasionally lifting or carrying
> articles like docket files, ledgers, and small tools.  Although a sedentary job is
> defined as one which involves sitting, a certain amount of walking and standing is
> often necessary in carrying out job duties.  Jobs are sedentary if walking and standing
> are required occasionally and other sedentary criteria are met.

---

[21]    The September 24, 2003 spirometry results list Gladden's height as sixty-five inches.  (R.
187.)  Table I requires an FEV1 equal to or less than 1.45 liters for someone sixty-five inches
tall (20 C.F.R., Pt. 404 , Subpt. P, App. 1, § 3.02A, Table 1); the results of Gladden's test
clearly exceed the maximum FEV1 allowed to qualify Gladden's asthma as an Appendix I
listed disability.  (See R. 187-88.)

20 C.F.R. §§ 404.1567(a), 416.967(a).  Gladden's past relevant work as a correctional facility

personnel officer qualifies as "sedentary"; Gladden never lifted anything heavier than ten pounds,

sat most of the day, stood no more than one hour and walked up to one and one-quarter hours.[22]

(See page 3 above.)

       The ALJ found that Gladden could "lift and carry up to ten pounds and stand, walk

and sit for six hours per day," provided that Gladden needed to avoid "exposure to dust, fumes, gases

and environmental irritants" and "overhead reaching with her non-dominant left arm." (See page 16

above.)  This finding is supported by the record.  Gladden stated that she could not carry or lift

anything with her left side, but could carry "two half [] gallons of milk and a juice" with her right

side, and also stated that she had no problems sitting or walking short distances. (See pages 4-6

above.)  Dr. Morelli wrote that although Gladden must work in a "smoke free environment," she

could occasionally lift and carry an unspecified weight and could stand, walk or sit without

limitations.[23]  (See page 8 above.)  Dr. Gundy noted that Gladden "denie[d] functional impairment"

and stated that she could "live with the pain." (See page 10 above.)  Dr. Schulman wrote, prior to

Gladden's July 2004 shoulder surgery, that Gladden "did not appear in any acute distress. . . . [and]

---

[22]    ALJ Reap correctly found that Gladden's job as a corrections officer constituted "past relevant work," because it had been performed within fifteen years of when Gladden claimed disability, and because Gladden had worked long enough to "learn to do the job." (R. 17.)

[23]    Gladden disputes that Dr. Morelli examined her left arm or shoulder and claims that his opinion concerning her ability to lift or carry is false. (Gladden Opp. Aff. at 3.) Dr. Morelli expressed this opinion in a New York State disability form. (See R. 217.)

32

was comfortable with sitting, standing, lying down and changing body position."[24]  (See page 11 above.)

      The only evidence contradicting ALJ Reap's finding that Gladden could resume past relevant work was Dr. Elia's opinion that Gladden could not return to work until future evaluations, and Dr. Luks' opinion that Gladden was "totally disabled."[25]  (See pages 9-10, 12 above.)  The ALJ was justified in determining that Dr. Luks' testimony was not "persuasive" in light of Gladden's contradictory statements concerning her shoulder and daily activities, and Dr. Morelli's, Dr. Gundy's and Dr. Schulman's assessments of Gladden's physical capabilities.  (See pages 4-6, 8, 10-11 above.)  ALJ Reap appropriately rejected Dr. Luks' evaluation because he did not support his "conclusion with any treatment notes or clinical findings."  (R. 16; see also R. 227-29, 253, 256, 263-64.)  See 20.C.F.R. §§ 404.1527(d)(3), 416.927(d)(3) (greater weight accorded opinions supported by medical signs and findings).  Furthermore, the ALJ was not required to give controlling weight to Dr. Luks' opinion given the conflicting evidence in the record and the lack of supporting medical evidence.  See 20.C.F.R. § 404.1527(d)(2) (a treating physician's opinion will be controlling if it is "well-supported by medically acceptable [evidence] and is not inconsistent with the other substantial

---

[24]    Jeanne Oberrieth, a State Farm Insurance Claim Representative, stated the following in a letter accompanying Dr. Schulman's June 2004 evaluation of Gladden: "He [Dr. Schulman] beli[e]ves you still need attention to your left shoulder.  In addition you are still disabled from the injuries in this auto accident of 11/20/02."  (Gladden Opp. Aff. at 11.)  Dr. Schulman's written evaluation belies this third party statement concerning Gladden's disability status.  (See R. 180-83.)

[25]    Both doctors based their opinions on the status of Gladden's shoulder problems and not on her bronchial asthma.  (See pages 10, 12 above.)  None of Gladden's doctors determined that she was disabled or could not work due to her asthma, as long as Gladden worked in a "smoke free environment" and "avoid[ed] . . . direct contact with fresh newspaper ink/fumes/smoke."  (R. 210, 216-17.)

evidence in [the] record."); see also, e.g., Halloran v. Barnhart, 362 F.3d 28, 32 (2d Cir. 2004); Veino

v. Barnhart, 312 F.3d 578, 588 (2d Cir. 2002); Schisler v. Sullivan, 3 F.3d 563, 567 (2d Cir. 1993).

The Commissioner holds ultimate responsibility for determining whether an individual is disabled,

and "a treating physician's statement that the claimant is disabled cannot itself be determinative."

Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999); see 20 C.F.R. § 404.1527(e)(1); see also, e.g.,

Matos v. Barnhart, 05 Civ. 10539, 2007 WL 943654 at *7 (S.D.N.Y. Mar. 27, 2007); Aronis v.

Barnhart, 02 Civ. 7660, 2003 WL 22953167 at *5 (S.D.N.Y. Dec. 15, 2003); Jones v. Barnhart, 02

Civ. 0791, 2003 WL 941722 at *10 (S.D.N.Y. Mar. 7, 2003).

ALJ Reap also was justified in discounting Dr. Elia's recommendations that Gladden

not return to work until re-evaluated at a future date. (R. 15.) Dr. Elia's recommendations referred

to Gladden's ability to return to work as a newspaper collector, and not her previous job as a

personnel officer, rendering Dr. Elia's opinion less valuable in assessing whether Gladden had the

residual functional capacity to perform all of her past relevant work. (See page 10.)

Substantial medical and functional capacity evidence supported the ALJ's conclusion

that Gladden was capable of resuming her former employment as a correctional facility personnel

officer. (R. 15-18.)

Because Gladden did not meet her burden of proof on the fourth step of the analysis,

the Court is not required to advance to the fifth step. See 20 C.F.R. § 404.1520(a)(4) ("If we can find

that you are disabled or not disabled at a step, we make our determination or decision and we do not

go on to the next step.").[26]

---

[26]    Accord, e.g., Quezada v. Barnhart, 06 Civ. 2870, 2007 WL 1723615 at *13 (S.D.N.Y. June
(continued...)

## CONCLUSION

For the reasons set forth above, the Commissioner's determination that Gladden was not disabled within the meaning of the Social Security Act prior to January 1, 2004 is supported by substantial evidence. The Commissioner's motion for judgment on the pleadings (Dkt. No. 12) is GRANTED. The Clerk of Court is to enter judgment for the Commissioner.

SO ORDERED.

Dated:      New York, New York
            February 29, 2008


                                        Andrew J. Peck
                                        United States Magistrate Judge

Copies to:    Hermena Gladden (Regular & Certified Mail)
              John E. Gura, Jr., Esq.

---

26/    (...continued)
       15, 2007) (Peck, M.J.); Papp v. Barnhart, 05 Civ. 5695, 2006 WL 1000397 at *16 (S.D.N.Y.
       Apr. 18, 2006) (Peck, M.J.); Rodriguez v. Barnhart, 04 Civ. 4514, 2005 WL 643190 at *12
       (S.D.N.Y. Mar. 21, 2005) (Peck, M.J.); Jiang v. Barnhart, 03 Civ. 0077, 2003 WL 21526937
       at *15 (S.D.N.Y. July 8, 2003) (Peck, M.J.); Walzer v. Chater, 93 Civ. 6240, 1995 WL
       791963 at *11 (S.D.N.Y. Sept. 26, 1995) (Kaplan, D.J. & Peck, M.J.) (citing Rivera v.
       Schweiker, 717 F.2d 719, 722 (2d Cir. 1983); Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir.
       1982); & Velk v. Shalala, 93 Civ. 3111, 1995 WL 217516 at *5 (S.D.N.Y. April 11, 1995)).